**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 8:09CR102 |
| vs. | ) | REPORT AND |
| GILBERTO TAPIA-URIBE, | ) | RECOMMENDATION |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Gilberto Tapia-Uribe (Tapia-Uribe). **See** Filing No. 13. Tapia-Uribe is charged in the Indictment with the possession of a firearm while being an alien unlawfully in the United States in violation of 21 U.S.C. § 922(g)(5) (Count I) and a criminal forfeiture of a firearm, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c) (Count II). **See** Filing No. 1 - Indictment. The defendant seeks to suppress all evidence and statements derived from his pat-down search and arrest on January 15, 2009. **See** Filing No. 13 - Motion to Suppress. On April 15, 2009, the defendant filed a pre-hearing brief in support of his motion. **See** Filing No. 14. The government filed a pre-hearing brief opposing the motion on April 23, 2009. **See** Filing No 16.

On April 28, 2009, the court held an evidentiary hearing on Tapia-Uribe's motion. Tapia-Uribe was present with his appointed counsel, Assistant Federal Public Defender Michael F. Maloney. Assistant United States Attorney Sandra L. Denton represented the United States. During the hearing, the court heard the testimony of Omaha Police Department (OPD) Officer Adam Turnbull (Officer Turnbull). The court also received into evidence a page of an OPD incident report form (Exhibit 101), and an OPD supplemental report (Exhibit 102). A transcript (TR.) of the hearing was filed on May 1, 2009. **See** Filing No. 22. The matter was deemed submitted upon filing of the transcript.

## FINDINGS OF FACT

Officer Turnbull is employed as a police officer by OPD and has over five years of experience (TR. 4). Since September 2008, Officer Turnbull has been assigned to patrol a downtown area of Omaha (TR. 4-5). On January 15, 2009, at approximately 2:45 a.m., an unidentified woman flagged down Officer Turnbull at the intersection of 24th Street and Landon Court, informed him of people arguing or fighting in a parking lot, and gestured toward the Nodaway Apartment building (TR. 5, 25). The woman did not appear to be intoxicated and conveyed a sense of urgency regarding the disturbance (TR. 25, 28).

Officer Turnbull had patrolled the Nodaway parking lot at least once every night since September 2008, and he had become familiar with the vehicles normally parked there as well as the residents who lived there (TR. 6). The area where the Nodaway Apartments are located is generally described as a "high-crime area," but the Nodaway Apartments, in particular, have a history of numerous disturbances and drug activity (TR. 5). The woman flagged down Officer Turnbull a half block away from the Nodaway parking lot, but the officer had to turn onto Landon Court and drive around the building to reach the parking lot (TR. 24, 27, 29). The Nodaway parking lot was not visible from the intersection where the woman flagged down Officer Turnbull (TR. 29). Accompanied by his partner, Officer Russell, Officer Turnbull drove to the Nodaway Apartments (TR. 6, 8). Due to their proximity to the Nodaway parking lot, the officers were able to drive there in a matter of seconds (TR. 29).

Upon arriving at the Nodaway parking lot, a green Cadillac caught Officer Turnbull's attention because it was "out of place," and not a vehicle he normally saw in the Nodaway parking lot (TR. 7, 36-38). The Cadillac also seemed "out of place" because residents of the Nodaway Apartments did not normally park their cars in the location where the Cadillac was parked, nor did they generally park their cars facing the direction the Cadillac faced (TR. 37-38). Based on these observations, Officer Turnbull parked his patrol car behind the green Cadillac and approached the vehicle and its occupants (TR. 8-9). Officer Turnbull asked the woman in the passenger seat if there were any problems, and she answered "no" (TR. 30). Tapia-Uribe, who sat in the driver's seat, stated he was dropping someone off, but Officer Turnbull knew neither of the vehicle's occupants lived in the

Nodaway Apartments (TR. 30, 33). Additionally, Officer Turnbull knew from his experience that when dropping someone off at the Nodaway, drivers normally stop on Landon Court to let their passenger out of the vehicle because the Nodaway parking lot is small, making it difficult for a drivers to turn their cars around (TR. 39). Officer Turnbull asked Tapia-Uribe for identification (TR. 10). Tapia-Uribe stated he did not have a Nebraska identification card or driver's license, and produced a Mexican identification card (TR. 10-11). Tapia-Uribe's female companion stated she did not have any identification. She gave the officer a name and a date of birth, stating, "you won't find anything on me" (TR. 10).

Officer Turnbull asked Tapia-Uribe and his female companion to exit the vehicle to conduct a pat-down search (TR. 11). Officer Turnbull testified he weighed several factors in deciding to conduct a pat-down search based on officer safety, which included: (1) a woman flagged down the officers and informed them of a disturbance in the Nodaway parking lot; (2) the time of night; (3) the officers were in a high-crime area and the Nodaway building was particularly known for drug activity and disturbances; (4) Tapia-Uribe and his companion sat in a car in an outside parking lot on a cold winter night, with a temperature below zero degrees; (5) Tapia-Uribe sat in the driver's seat of the vehicle, but had no driver's license; and (6) the statements made by Tapia-Uribe and his companion were unusual (TR. 5, 7, 12).

Officer Turnbull conducted a pat-down search of Tapia-Uribe to search for weapons (TR. 14). In conducting the pat-down search, Officer Turnbull first discovered a methamphetamine pipe in Tapia-Uribe's coat pocket (TR. 14-15). Officer Turnbull became concerned because Tapia-Uribe kept turning his right hip toward the vehicle, so the officer continued the pat-down, and discovered a 9-millimeter handgun concealed in Tapia-Uribe's waistband (TR. 15-16). At that point, Officer Turnbull arrested Tapia-Uribe, placed him in handcuffs, and continued the pat-down search (TR. 16-17). The pat-down search revealed a knife and a Nebraska identification card concealed on Tapia-Uribe's person (TR. 17). Officer Turnbull conducted a data check on the Nebraska identification card and discovered there was no record of a Nebraska driver's license or identification card belonging to Tapia-Uribe (TR. 17-18). The Nebraska identification card found in Tapia-Uribe's possession was not valid (TR. 17-18).

Officer Turnbull transported Tapia-Uribe to the Omaha Police central booking station (TR. 18). At no time during or prior to transporting Tapia-Uribe to the Omaha Police central booking station did the officers give Tapia-Uribe a *Miranda* warning (TR. 19). While in transit, Officer Turnbull did not attempt to question Tapia-Uribe (TR. 18-20). Prior to arriving at the Omaha Police central booking station, Tapia-Uribe asked the reason for his arrest (TR. 20). When Officer Turnbull told Tapia-Uribe he was arrested for possession of drug paraphernalia, Tapia-Uribe responded by admitting to having used marijuana, but denied having ever used methamphetamine (TR. 20-21). Additionally, Tapia-Uribe stated he had found the gun in a dumpster about a week before (TR. 19).

## LEGAL ANALYSIS

Tapia-Uribe argues all evidence obtained from him on January 15, 2009, should be suppressed because he was subjected to an unlawful search, violative of his rights under the Fourth Amendment. **See** [Filing No. 13](). Tapia-Uribe asserts officers had no reasonable suspicion to believe he was involved in criminal activity and no reason to believe he was armed and dangerous. Tapia-Uribe also argues the statements he made to Officer Turnbull should be suppressed.

**A.    Detention**

The Fourth Amendment protects against unreasonable searches and seizures. [U.S. Const. amend. IV](). "The Fourth Amendment applies to seizures of the person, including brief investigatory stops." [*United States v. Cortez*, 449 U.S. 411, 417 (1981)](). "For purposes of constitutional analysis, such a stop is characterized as an investigative detention. [*United States v. Jones*, 269 F.3d 919, 924 (2001)]() (**citing** [*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)]()). An investigative detention is constitutional if the police have a reasonable suspicion that the person detained is, or is about to be, engaged in criminal activity; reasonable suspicion requires a particularized and objective basis for suspecting the person detained of criminal activity. [*Ornelas v. United States*, 517 U.S. 690, 696 (1996)]() (**quoting** [*Cortez*, 449 U.S. at 417]()); **see** [*Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)](). "When determining whether a police officer had reasonable suspicion of criminal

4

activity, we must view the totality of the circumstances 'as understood by those versed in the field of law enforcement.'" *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000) (**quoting** *Cortez*, 449 U.S. at 418).

In this case, an unidentified woman flagged down Officer Turnbull late at night, in a high-crime area, and urged him to investigate a disturbance in an apartment parking lot with a history of numerous disturbances and drug complaints. Following this urgent warning, Officers Turnbull and Russell proceeded to the Nodaway parking lot. Officer Turnbull was appreciably familiar with the Nodaway apartment building, and upon arrival, the officer immediately noticed a vehicle that was unfamiliar and "out of place." Based upon the totality of these circumstances as understood by Officer Turnbull, one versed in the field of law enforcement, the court finds the officer had an objectively reasonable suspicion that Tapia-Uribe was, or was about to be, engaged in criminal activity at the time Officer Turnbull detained Tapia-Uribe by parking his cruiser behind Tapia-Uribe's vehicle. Tapia-Uribe does not contest Officer Turnbull's justification for approaching Tapia-Uribe to make inquiries.[1] In any event, the officers were legally justified in conducting an investigative detention, and the officers did not violate Tapia-Uribe's Fourth Amendment rights by detaining him for purposes of an investigative detention.

**B.     Pat Down Search**

The court has already determined the officer in this case had reasonable suspicion to detain Tapia-Uribe. The court must now determine whether the officers in this case could reasonably believe Tapia-Uribe may have been armed and presently dangerous, so as to justify conducting a pat-down search of the defendant.
Due to the great risks associated with conducting investigatory detentions, the Supreme Court has indicated that limited, protective searches in the interest of officer safety are constitutional. *United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (**citing** *Terry*, 392 U.S. at 22-27). A pat-down search is constitutionally reasonable if the officer "observes unusual conduct which leads him reasonably to conclude in light of his

---

[1] During the hearing the court asked Tapia-Uribe's counsel if he was "arguing that the officers had no right to approach Mr. Uribe and inquire?" Counsel responded, "No, Your Honor" (TR. 49).

experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30; **see** *Gray*, 213 F.3d at 1000; *United States v. Davis*, 202 F.3d 1060, 1061 (8th Cir. 2000).

In order to determine whether facts and circumstances surrounding a *Terry* search and seizure give rise to reasonable suspicion, the totality of the circumstances--the whole picture--must be taken into account.

> While the "purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," officers may lawfully seize contraband they incidentally discover in "plain touch" during a *Terry* frisk.

*United States v. Bustos-Torres*, 396 F.3d 935, 943-44 (8th Cir. 2005) (**quoting** *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)); *see United States v. Winters*, 221 F.3d 1039, 1041 (8th Cir. 2000) (police officer may take steps reasonably necessary to protect his personal safety and to maintain the status quo).

"The Supreme Court has held that a reasonable fear of harm is sufficient to justify a seizure for a short period of time, in order to conduct a pat-down search, in certain circumstances." *United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007) (**citing** *Terry*, 392 U.S. at 29). "To be constitutionally reasonable, a protective frisk is only warranted if 'specific articulable facts taken together with rational inferences' support the reasonable suspicion that a party was potentially armed and dangerous. *Id.* at 961 (*quoting United States v. Clay*, 640 F.2d 157, 159 (8th Cir. 1981)). "Substantial latitude in interpreting and drawing inferences from factual circumstances" is given to law enforcement officers. *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). Additionally, the United States Supreme Court explained that when "the stop occurred in a 'high crime area', [this is] among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Finally, when an officer approaches a parked vehicle for investigation, generally a suspect inside the vehicle is not detained or seized until he is removed from his vehicle. *United States v. Barry*, 394 F.3d 1070, 1076-78 (8th Cir. 2005)

(citing cases); **see *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir. 1995)** (holding suspects were not seized within the meaning of the Fourth Amendment when deputy pulled his vehicle behind parked car and activated amber warning lights).

Based upon the totality of the circumstances, Officer Turnbull was justified in initiating an investigatory detention and conducting a pat-down search of the defendant for officer safety. Officer Turnbull considered several factors before making the decision to conduct a pat-down search of Tapia-Uribe. Those factors included: the late time of night, the urgent warning that officers investigate a disturbance, the high-crime nature of the area, the history of disturbances and drug complaints at the Nodaway Apartments, and the suspicious statements made by Tapia-Uribe and his companion. Specifically, Tapia-Uribe's stating he was dropping someone off was suspicious to Officer Turnbull given the position of the green Cadillac. Tapia-Uribe's stating he did not have any form of identification other than a Mexican identification was also suspicious to Officer Turnbull given Tapia-Uribe sat in the driver's seat of the green Cadillac. Additionally, Officer Turnbull's suspicion increased when Tapia-Uribe's companion stated she did not have any identification, but gave a name and date of birth, while adding "you won't find anything on me." Based upon the factors indicated, a law enforcement officer could reasonably believe Tapia-Uribe was presently armed and dangerous, and have a reasonable fear of harm.

Giving law enforcement officers substantial latitude in interpreting and drawing inferences from the circumstances, as directed in ***Washington***, the court finds Officer Turnbull made reasonable inferences from the totality of the circumstances based upon his experience and his concern for officer safety. **See *Washington*, 109 F.3d at 465**. The court finds Officer Turnbull reasonably suspected Tapia-Uribe may have been presently armed and dangerous, and did not violate Tapia-Uribe's Fourth Amendment rights by conducting a pat-down search for weapons concealed on Tapia-Uribe's person. Accordingly, the court finds physical evidence obtained during a pat-down search of Tapia-Uribe, conducted for officer safety, is admissible because such evidence was discovered during a lawful search of Tapia-Uribe.

## C. Admissibility of Statements

Tapia-Uribe argues the statements he made to Officer Turnbull while in transit to the Omaha Police central booking station should be suppressed. The court has already found Tapia-Uribe was not subject to an illegal detention or search, therefore statements asserted to be suppressed as the fruit of an illegal search should not be suppressed under *Wong Sun v. United States*, 371 U.S. 471 (1963). Because there is no dispute Tapia-Uribe was never given a *Miranda* warning, however, the court must examine whether the statements were made pursuant to a custodial interrogation. **See** *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V*. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004). The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda*, 384 U.S. at 467).

There can be no doubt Tapia-Uribe was in custody when he made statements to Officer Turnbull. "An individual is 'in custody' when he has been formally arrested or his freedom of movement has been restrained to a degree associated with a formal arrest." *United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988) (**citing** *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). At the time Tapia-Uribe's statements were made, Tapia-Uribe was in handcuffs, sitting in the police vehicle, and being transported to the Omaha Police central booking station. Under the circumstances, no reasonable person would feel free to leave. Accordingly, the court finds Tapia-Uribe was in custody when he

made statements to law enforcement officers. This finding does not necessarily mandate suppressing statements made by Tapia-Uribe, however. "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996) (**quoting** *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989)). The court must determine whether Tapia-Uribe's statements were made in response to police interrogation.

"Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Tapia-Uribe's statements made in the police vehicle were in response to Officer Turnbull informing Tapia-Uribe of the charge against him. Under these circumstances, the officer could not reasonably expect his conduct would be reasonably likely to elicit an incriminating response from the defendant. **See** *Pennsylvania v. Muniz*, 496 U.S. 582, 603-04 (1990) (indicating communication or instructions necessarily "attendant to" police procedure, such as sobriety tests, not likely to be perceived as calling for any incriminating response); **see also** *United States v. Briggs*, 273 F.3d 737, 740-41 (7th Cir. 2001) (concluding no interrogation where officer responding to inquiry of suspect); *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (no interrogation where officer did nothing more than tell suspect why he was being arrested). Although Tapia-Uribe was in custody when he made statements to law enforcement officers, Tapia-Uribe's statements were not in response to police interrogation. Therefore, Tapia-Uribe was not entitled to a *Miranda* warning prior to the communication.

Tapia-Uribe's statements were not in response to an interrogation by the officer, and they were not the result of coercion or intimidation. Nor were the statements made during a conversation initiated by Officer Turnbull. The court finds Tapia-Uribe made the statements spontaneously and voluntarily. Accordingly, statements made by Tapia-Uribe while being transported to the Omaha Police central booking station should not be suppressed. Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Gilberto Tapia-Uribe's Motion to Suppress (Filing No. 13) be denied.

## ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 2nd day of June, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge